I'm going to jump, because my time is limited, I'm going to jump directly to the Confrontation Clause issue, which is the issue of the either the 8 or 10 or the 20 to 23, which is the issue of the either the 8 or the 20 to 23, which is the issue of the either the 8 or the 20 to 23, depending on whose testimony one accounts. Surveillance officers who were watching this drug bust unfold, there was testimony from Agent Meza and there was testimony from Agent Rubino, which was essentially the equivalent of a note-taking police officer reciting what other police officers had purportedly seen as this event unfolded. I mean, it wasn't as I understand the government's argument about this, and I think what the judge held, it was, well, first of all, I guess there's some question about whether it was adequately raised, right, because it was raised at the beginning, but not during the trial, the Confrontation Clause issue. Is that right, or am I confusing the two? That's correct. It was raised pretrial, but the defense counsel did not say the magic word, confrontation, at the point when the testimony came in. So the actual ruling was more of a hearsay ruling? Excuse me? So the actual ruling that was made at trial was more of a hearsay ruling? That's correct. But even assuming that we reached it. I mean, the core question is, isn't it, whether this was a testimonial statement under Crawford. And it was something that was – I mean, it had a function, operative function at the time that it was happening, did it not? In other words, it was being done, as I understand it, so that the people who – other people who were involved in the arrest would know what was happening and when to undertake the arrest. Is that not right? Well, there was – yes, that was part of the purpose, but it was similar to a drug analyst who's testing drugs. And they – No, it's not similar to a drug analyst, because the drug analyst's testimony stands alone. I just finished a trial very similar to this in district court up in Seattle, and the jurors were like, oh, my God, don't tell me they're going to bring in another police officer to testify to what he saw from the vantage point that we just heard about four other officers testify to. I mean, these are done for officer safety of the undercover and, you know, positioning of where the officers are in case somebody is arriving that they have eyes on. If somebody's departing, they have eyes on and things like that. But it's not done for purposes of testimony the way this is the only evidence establishing that this is a drug or this is the only evidence establishing who the perpetrator was. It's got to be different than that. Well, there may have been multiple purposes, but the fact of the matter is that the government never put on a showing to show that it was done solely for officer safety. They never put on a showing as to what the purpose was. Your Honor may have had. But it wasn't at least one of the people who testified, the person who ultimately did the arrest. One of the people did the arrest, that's correct. But he was blocks away. Right. He was blocks away and he was being informed so that he could come and do the arrest. But the testimony that he gave, Your Honor, was not testimony about solely confined to the arrest. The testimony gave times, it gave streets, it gave – it described what the defendant was doing. He was walking into a restaurant, he was walking out of a restaurant. And the officer who was testifying to that, Officer Mazin and later Officer Rubino, weren't present when that was occurring. So the Confrontation Clause may, unfortunately, or the Constitution always creates some barriers and it can create some inconvenience. But – and I think that's what the government argued here. We don't have to bring in 20 police officers to corroborate our informant. But the fact that – But Judge White's ruling was not that he gets to say everything. It's we'll do it on an issue-by-issue basis. And if counsel has an objection that we're getting into true testimonial, such as what the defendant said to another officer after being Mirandized or something like that, then Judge White was prepared to say, no, that's – that is going to violate – that's not a present-sense impression, it's not admissible, and I think he would have considered the Confrontation Clause in that regard. But there was a certain amount of background that he was going to allow in. And without a specific objection at trial, beyond the hearsay objection, how was the trial judge to know what defense thought was testimonial and what wasn't? Well, to the extent that we have to argue plain error, I think this was plain. I mean, you can't – All of it or some of it? Yeah, all of it. All of it was – was plain error in this case. But surely at the point that they were notified that it was time to come and arrest him, that couldn't be plain error. No. I mean, that couldn't be a testimonial statement. I mean, I don't know. I'm talking about all of it with respect to corroboration of the informant, which is where the prejudice comes in. Certainly, they – that they heard the informant say, Lake Tahoe, which was the sign to come in and make the arrest, I don't think that that necessarily presents a serious confrontation clause problem. But what does present the problem is this painstaking, step-by-step corroboration of what street the defendant was on, whether he was in the restaurant, who he was talking to, what was going on, blocks and blocks away that's being broadcast by numerous. I mean, it is a strange way to proceed, and I have two questions. One is, was any explanation ever given at trial or afterwards about why the people who were on the scene and – there were some surveillance people other than the confidential informant who were there, right, whoever was transmitting this information, and that person did not testify. Was any explanation ever given? Not that – not that I can recall from the record. He would just put them on that there was an explanation. The officers who testified certainly gave an explanation of what they were doing and why they were there, Meza, Rubino, and so forth. But there wasn't any showing, and the government has the burden of making that showing as to why these other people were out there other than the fact that they were surveilling the situation. Well, of course, your client absconded for 10 years or so, and, you know, people move on to other lives. They die. They – you know, some of these problems were created by his failure to appear in 1999, weren't they? But there's nothing in the record about that. There's nothing in the record that says that any one of these other surveilling officers was unavailable. And then another question, my other question is, what is the closest case that you know of that supports you or doesn't support you? I have trouble finding anything terribly similar. Yeah, I agree. I mean, this is – this is a, you know, the Supreme Court's jurisprudence so far since Crawford has pretty much centered around what is testimonial. And the – I'd say the closest case is probably Bullcoming, which is that latest New Mexico case where the surrogate comes in and testifies as to the lab report. And the reason is the reason. It was dangerous in a risk way, but it wasn't, there was no actual physical danger going on at the time, but there could be, and that's why they were doing it. So where does this fit? Well, I mean, the only danger was a danger that was inherent to this kind of a drug situation, but there was no special showing of danger or a risk of safety. But there's the emergency case, is it Davis, is that the emergency case? Yeah. I mean, there is a sentence in there, as I recall, that says something about, well, we're not saying it only has to be an emergency. It just has to be something where the statements are being made non-retrospectively and not for purposes of prosecution, essentially. That's not the only test. I mean, the Supreme Court's analysis is hardly being clear, but if you look at Michigan versus Bryant, where the court goes through all these different factors and ultimately finds that the statement in that case was testimonial, the one of the factors is the formality, and that is, was the police officer talking to someone on the street who was bleeding to death, or was the police officer presenting information in a more formal way? This is police officers transmitting over a police radio a formal act, police officers taking notes on what is being said over the radio. We don't even have a recording of what was said. There is no way to cross-examine the police officers who supposedly made these observations. And that's where the Confrontation Clause problem comes up. So it's not just a matter of fitting this in a box. It's a matter of looking at what is the – what are the core values that the Confrontation Clause guards against, and then looking at the situation and saying, why shouldn't Mr. Solario have been able to cross-examine these police officers who were supposedly describing what he was doing, what the informant was doing, what his sidekick was doing, when they weren't in court? So it's – I mean, it's – it seems to me that that's the core – the core problem. And let me give another example. You didn't like my example of the drug analyst. But, I mean, if, say, a police officer is driving in a patrol car, is broadcasting over the radio, sees somebody throw a brick through the window, and he broadcasts it over the radio, could – I don't think that you could just bring in the person who listened to the radio to convict the person who threw the brick. He'd have to bring in the officer who saw him throw the brick. And that's what happened here. Roberts. Right. I would – I would allow the jury to hear it, and I would tell the jury it does not offer for the truth of the matter asserted, but just to show why the officer then followed up on the investigation. So it's not admitted for the truth. But, you know, you still allow it in as a present sense of pressure to complete the picture for, you know, what happened next. But – okay. Counsel, you're down to less than three minutes. Okay. I'll reserve the rest of my time. You may do so. Thank you. We'll hear from the Governor. Good morning. May it please the Court. My name is Lori Gray. I represent the United States. And I will begin by jumping right into the Confrontation Clause issue. Here, the surveillance statements were not testimonial. Case law is clear that only testimonial statements involve the Confrontation Clause, and Crawford, in every case since it, has made a – drawn a line between those statements reporting past activity, which are testimonial, and statements describing events as they are happening, which are non-testimonial. But why should that be? I didn't see that distinction necessarily in the cases. Where is that? Well, in each of those cases, for example, in Crawford, they excluded – the Supreme Court excluded the wife's tape-recorded statement, which was made at the police station hours after the event. Well, I understand that, but – and it may well be that when something is contemporaneous, there's another explanation for it. But the cases don't turn on whether it's contemporaneous, do they? That's one of the factors. You're right, Your Honor, that's one of the factors. But in fact, that has been the way those cases have broken down. So defense counsel in this case is asking you to radically move that line. And in going to that analysis, I would just like to reaffirm that, in fact, the review for this Court is plain air, that while it was raised pretrial, that the Court at that time, at Excerpt of Record 62, said, I'm going to withhold ruling until I see what it is specifically that's offered. When that testimony was offered at trial, every time defense counsel stood up and objected on hearsay grounds, the Court, as Judge Lasnik pointed out, said, I'm letting it in under a present-sense impression. Counsel did not circle back and say, wait a minute, I've got another objection. Sotomayor, is your argument essentially that the present-sense impression, hearsay exception, overlaps with the Confrontation Clause testimonial inquiry such that a present-sense impression can't be a testimonial? Well, in this case, and it is a fact that we consider Michigan v. Bryant tells us that. That's the most recent Supreme Court case in this area that came out in February 2011. And in that case the answer is no, I think that it is, it's not, it's not testimonial, but it informs, it's not testimonial because it's contemporaneous, and that's one of the factors. In Michigan, the Court said that in making a primary purpose determination  which is what we must do, standard rules of hearsay designed to identify some statements as reliable will be relevant. But if an officer transmits to another officer, the defendant just admitted that he's a drug dealer and he has a friend at this location who has the drugs, that's not going to be admissible as a present-sense impression. It is not. That's correct, and that would be testimonial. And again, Michigan v. Bryant tells us this is an evolutionary process. It cites the 911 case, Your Honor, that you referred to Davis, and it says that what begins as a non-testimonial situation can evolve into a testimonial situation much akin to the Fifth Amendment. Suppose the police simply assigned somebody to every drug bust to get a contemporaneous and to record a contemporaneous narrative so that they could testify later. But that person had no functional role except to get the information. Well, I think, again, Your Honor, you have to look at the primary purpose. In this case, it was being monitored in real time, an undercover operation. And the reason for relating those statements, which had to be precise and accurate, was for both the safety of the informant and for the safety of the public. The witnesses' -- And what I understand Mr. Schwartz to be saying is this, okay, they had to know something, but why did they have to know they were walking down the street and they were doing this and they were doing that? I mean, basically what they had to know was it's now time for you to come in. What else do they have to know? Well, again, Your Honor, for the safety of the informant and the safety of the public and the agent, Rubino, talks about that in Excerpt of Record 174 and 170. She's asked, what was your role in this, and she said to listen to the wire for the security of the informant. And then when defendant at the prior, what was supposed to be the prior drug sale aborted because he wanted it on his home turf, the agent testified at Excerpt of Record 170, we have an operational plan set up. We don't move because it's a safety concern. And that is the case here, Your Honor, in that this was- Well, that's a general statement. But more specifically, why was the step-by-step narrative part of the safety methodology? The defendant could have pulled a gun. He could have taken out running. Someone else could have appeared from somewhere. A car could have run around the corner. This was a $25,000, 5-pound methamphetamine deal where the defendant had moved it to his home turf to be in control. There was a recording earlier in that day, the call that set it up, and defendant sets the time, sets the place, reaffirms that it's going to happen, don't be worried. The officers knew from their prior experience that another person was involved. He had arrived in the same van. They didn't know if that other purpose had a propensity for violence. They didn't know. So they were monitoring this in real time. It was contemporaneous statements. It was a fluid situation. It is much more akin to the emergency cases that the Supreme Court has found than those cases such as Bull Coming or the reporting cases of certified tests of drugs. You could make a better argument that it's not relevant to admit that all at trial, because what difference does it make, you know, what they were worried about if nothing bad happened, but it does explain that they're not there to create a testimony for trial. They're watching, eyes on what's going on. But, counsel, were you the trial assistant? I was not. I was not. Okay. Obviously, one of the issues that we're looking at is the chain of custody on the meth itself, which, you know, did create some issues, and I think it goes back again to this long delay between the arrest and the trial. But what do you have to say about the chain of custody here where the person who actually does the analysis of the drug says, I don't know, somebody gave it to me and said test it, and it has at least changed significantly in weight and perhaps in appearance? Well, as the Supreme Court said in Melendez-Diaz, not everyone who lays hands on the evidence needs to be called, and gaps in the chain of custody. We're not talking about Confrontation Clause. No, no. We are now talking about the efficiency of the evidence, given the fact that the – there was certainly a weak chain of evidence here in terms of whether that meth was the meth that was originally gathered. Well, the gaps – It looked different. It was a different weight. It was in different packaging, as I understand it. And there was no explanation for any of that. There was no explanation for who had opened it. Two people had opened it sometime during that time period, but no explanation of who. And there seemed to be a significant weight loss. Well, let me address that, Your Honor, because I think that the evidence more than shows that there was – we closed the gap on that chain of custody. Based on the testimony of Special Agent Mazza, who seized the bag at the time from the microwave in the van, he gave that bag to Special Agent Moonshaw, who testified at trial. And Agent Moonshaw testified that at the time, he took out these five off-white colored discs that were sprinkled with coffee, sealed the bags, put it in the safe for transfer to a lab, and he explained the protocol of how that is done. He explained the DEA-7 report that is used to monitor and to note. And the evidence tag at trial, which is supplemental excerpt, our government's excerpt, page 1, showed his notations, his date, his time, and the – The one thing we know is that something happened to that stuff in the meanwhile because it looked different than when he put it in. It was in pieces. It was not wrapped in cellophane. It was a fair amount less of it. So something happened that nobody ever explained. Well, Your Honor, if I can finish, he noted on the evidence tag the case number, 99-0081. Eleven years happened, and he looks at the bag and he says, there is my evidence tag. And he's asked at excerpt of record, government's excerpt of record, 74. Now, take a look at that exhibit. Is it different or how has it changed? And he says, well, it's no longer in disk form. It's chunky. It's off-white powdery, which would have been done at the lab. This looks like part of the original disk. There is still some shape, part of a disk. That was his testimony. The chemist comes after him and she identifies her signature on the bag and the same case number, 99-0081. So, Your Honors, I would submit that closed the gap. The evidence proved that the drugs – Because the same piece of paper was on it? I mean, that's all you've got, basically. Well, she's got her notations inside on the evidence with the same case number that she referred to it. And so that went to the weight of the evidence, not its admissibility, and it was tied through from Special Agent Munshaw. Was there a significant weight loss? I – Your Honor, I'm sorry. I don't remember what the weight loss was. I don't remember the difference in the weight loss. I do – but we do have the testimony, as I pointed out, of the agent that, you know, it had deteriorated over time. Let's look at it another way. We know that something happened to that stuff between when the original officer who put it there had it and when the person who tested it got it. Well, what we know – Something significant happened to it. Well, what he says, it's no longer in disk form. Beyond that, you know, he says it's – Well, there's a lot less of it, and it's not wrapped the same way. It was originally wrapped in cellophane, as I understand. Each individual one was wrapped in cellophane, and each one was in a separate plastic bag. And it's completely different in its appearance, its shape, and also how it's in there, how it's wrapped, and there's less of it. So something happened. I disagree with the Court on a couple of your – of the bases there. At excerpt of record, Government excerpt of record 72, the agent who seized it originally specifically says, at SCR 72 on to 73, what I recognize is this bag indicating this is the original bag that I filled out. And then he goes – Right. There was a – my understanding is there was a big bag, but in it were little bags, and the little bags weren't there anymore. Right. And then he – but he looks inside, and he's – and he looks inside, and he tells how it is the same, that it looks like part of the disk. It looks like the same shape. It looks like they've been quartered. So I disagree with the Court that there's no evidence that it was the same. The officer testified to how this looked to be the same drugs. And then he testified with regard to the protocol and how that is followed. And I agree, over 11 years, this could have devolved or decomposed in some way. But there is testimony in the record that this was similar and appeared to him to be the same drugs. Ultimately, isn't this a jury question? It is for the jury, Your Honor. And the gaps in the chain of custody go to weight, not admissibility. That's for the jury to decide. And they did. And as you all know, that is a very deferential standard of review under Nevels. And the evidence in this case proved that the drugs seized from the band in 1999 were the same drugs analyzed in November 2009. Thank you, counsel. Anything further? I don't know if there's any other questions. I'm happy to answer them. No further questions. Thank you, counsel. If not, I would submit on the briefs and the argument. Thank you. Very well. Mr. Schwartz, you have some reserved time. Going to the chain of custody issue, which the Court asked about, the — this is an issue that was preserved. It was made in the Rule 29 motion of the principal defense put on by the defendant at trial. The amount of drugs shrunk somehow from about 2,400 grams to about, I think it was 1,800, which is what, 1,846 or 1,848 that — Just what, about a pound and a half? A pound and a half. That Ms. Huntington found. I'm sorry, what? Ms. Huntington, who — I know, but a pound and a half. She said, is it a pound and a half? That's what she said. About a pound and a half. Yeah, about. Yeah. Yeah. So — But — And there's no — all we know — I'm sorry. I'm sorry, because you don't have too much time.  The problem, it seems to me, is that this isn't a chain of custody question, i.e., nobody objected to the introduction of the evidence. So what we really — and maybe if they had, it shouldn't have been admitted, but that was neither argued below nor argued here. So what we have instead is a sufficiency question, and doesn't that make a lot of difference? Well, but I think part of the reason that there was no objection to admissibility was the fact that it — whatever it was, it had some tendency to prove — to be what they purported it to be, and it had some tendency to prove the fact that was at issue. So it was not — Well, if that's true, then it probably is true. So it's hard to say why it wasn't admissible, whether it's sufficient. But in that case, then how can it support a conclusion that the entire case lacks sufficiency of evidence? Because, I mean, first of all, the — they were told it was meth. The preliminary stuff was meth, the sample. There was a preliminary test that indicated it was probably meth. And for whatever this is worth, there is some connection between this and what was originally tested. So why isn't that enough if you're looking at it as a sufficiency of the evidence question rather than as an introduction of evidence question? Well, because most prosecutors would say, you know, you need the smoking gun or you  And in this case, they brought the drugs in, but they — there's no showing that they were the same drugs. There was no showing that it was unreasonable. Well, there was a little showing that it was the same drugs. I mean, there was a little showing. Well, they showed that the piece of paper was the same. Maybe it wasn't enough in itself to be beyond a reasonable doubt. It probably wasn't. But it doesn't have to be. Each little piece doesn't have to be beyond a reasonable doubt. And couldn't that be argued to the jury as a theory? Yes. And so it's admissible, or at least without objection, and the question is, goes to the weight, no? Well, except that, yes, but it's the — it's the duty of the district court and ultimately the court of appeals to make the constitutional ruling on whether there was sufficient evidence beyond a reasonable doubt. So I guess I'd like you to tell me, even though you're out of time, why, looking at all of the evidence, there was not sufficient evidence? Why was what? Why, looking at all of the evidence, there was not sufficient evidence that this was meth? Or that there was meth? Because of this was meth, that what he sold was 500 grams of meth. Because the charge was conspiring and possessing more than 500 grams. Right. And the prosecution had to prove not just that it was methamphetamine or a speck of it was methamphetamine, but there were at least 500 grams of methamphetamine. And they couldn't do that without the right drugs. All right. Thank you, counsel. Thank you. Your time has expired. Thank you very much. The case just argued will be submitted for decision. And we will hear argument next in United States v. Romo-Chavez.
judges: Lasnik, O'scannlain, Berzon